[Crim. No. 18090. Second Dist., Div. One. Sept. 10, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
HIYLON FRAZIER, Defendant and Appellant.

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK W. FULLER et al., Defendants and Appellants.

(Consolidated Cases.)

## COUNSEL

Richard S. Buckley, Public Defender, Arthur S. Morgenstern, James L. McCormick, and Floyd W. Davis, Deputy Public Defenders, for Defendants and Appellants.

Roger Arnebergh, City Attorney, and Madeleine Flier, Deputy City Attorney, for Plaintiff and Respondent.

## OPINION

WELLS, J.* — In the Municipal Court of the Los Angeles Judicial District defendants were charged with, and at a consolidated trial were tried and convicted by a jury of violating Penal Code section 653g. On appeal the Appellate Department of the Superior Court of Los Angeles County reversed· the judgments on the ground that they were not supported by substantial evidence, and certified the transfer of the appeal to us; and we so transferred the appeal. The sole question raised before us is whether the evidence supports the verdicts. We hold that it does not as to defendant Frazier but does as to defendants Fuller and Caldwell.

The evidence was that at all times herein Locke High School, in the City of Los Angeles, was bordered on the south by 111th Street, on the west by San Pedro Street, on the north by 109th Street, and on the east by Avalon Boulevard. The main entrance was on 111th Street, which is a residential street. The school hours were from 8 a.m. to 3 p.m. A hot-dog stand (stand No. 1) was located 30 feet from the school property at the southeast corner of Avalon Boulevard and 111th Street, and another hot-dog stand (stand No. 2) was located 20 feet from the school property at the southwest corner of that intersection. Both hot-dog stands had parking areas. Defendants were arrested on November 20, 1968, defendants Fuller and Caldwell in the area of stand No. 2, and defendant Frazier in the area of stand No. 1.

Los Angeles Police Department Officer Hines testified that during the period of October and November 1968, gambling by juveniles and young adults was one of the main activities in front of the school. There was gambling at the stands and on 111th Street during the day, just about every day,

---

*Assigned by the Chairman of the Judicial Council.

consisting of crap games with dice. In October 1968, there were 20 to 30 fights at the stands; and during October and November young men who were not students were fighting at the stands throughout the day. During this period, numerous people were under the influence of both narcotics and alcohol in the area of the school, from five to ten a day. This was also true at the stands and along 111th Street and arrests were made for these violations. During the period police officers in the area would tell students to return to school and advise the nonstudents as to the loitering law around the school and suggest that they leave.

The vice principal of the school testified that he had received complaints from residents and teachers about the situation. He had seen marijuana smoked at the stands during the school day by students and nonstudents. Also, on numerous occasions, he had seen girl students leaving the school being grabbed by young men and pulling away from them. During the above period he made numerous calls to the police concerning the problems at the school. Fights and gambling and several narcotic arrests occcurred at the stands. A crowd would gather at stands 1 and 2 between 11 a.m. and 3 p.m., consisting of 15 to 20 of the same persons. Gambling occurred every day there. Fighting also occurred every day and disturbing the peace was constant. Arrests were made for gambling, narcotics and fighting in the school area, one officer making between 20 and 50 narcotic arrests. The community and the police had numerous calls and complaints by the citizens and the principal of the high school of loitering, hanging around school grounds, throwing rocks at cars, gambling, stealing cars, stripping cars, etc.

During this period of October and November 1968, defendant Fuller had been seen at the school area on numerous occasions, usually standing out in front of the school. On one occasion he was under the influence of a drug or alcohol and on two occasions Officer Hines explained the loitering law to him and advised him that he should not be around that location, that it was illegal to loiter around the school unless he had some type of business, and requested him to leave. After these warnings, Fuller left the area. He had been seen at both hot-dog stands and along the street. Officer Baldwin testified he saw defendant Fuller around the school during school hours every day in October and November 1968. Most of the time he was either standing outside of a third hot-dog stand or had his car parked on the street or in stand number 2, and would be working on his car and have the hood or trunk open. The officer testified that defendant Fuller did not seem to have any directional purpose, he was just standing, not having anything in his hands, talking to several people. Gambling was going on and

numerous fights and several narcotic arrests were made in close proximity. Defendant Fuller was present at a gambling game. At times his vehicle was parked in the parking lot of stand number 2 and he was within 5 feet of a gambling game going on, and he was also in the location of a gambling game at stand number 1. Officer Baldwin had a conversation with defendant Fuller and asked him if it was his vehicle he was standing by and he said that it was and that he was not a student, and the officer told him that if he was not a student he would have to leave the area; and on each occasion he would get in a car or leave or drive his own car away. On some occasions Fuller had his car parked in no-parking zones on 111th Street.

Officer Baldwin testified that he had seen defendant Caldwell numerous times a day on numerous occasions prior to November 20, 1968, and had conversations with him during school hours. The officer asked him if he was a student and told him if he was not a student he should leave the area and if he was a student he should be attending school. On each occasion, Caldwell would go in the opposite direction of the school. Before November 20, 1968, Officer Baldwin had a conversation with a group that included Caldwell at stand number 1, where a gambling game was going on which broke up at the appearance of a police vehicle. The officer advised the group that if it proceeded there would be arrests made for gambling and being present at a gambling game.

The vice principal of the high school knew defendant Frazier, who was a student at the school up until March 1968, after which the vice principal saw Frazier on numerous occasions, including in October and November 1968. At one time during the school day, Frazier was brought to the vice principal's office by the security officer for being on campus. He was advised to leave the school or be picked up by the police department.

Officer Baldwin saw defendant Frazier around the school on numerous occasions before the instant arrest. On some of these occasions, the officer observed Frazier on 111th Street during school hours, and also observed fighting, disturbances of the peace, and narcotics on the south side of 111th Street. The officer testified that he saw Frazier in the vicinity of gambling every day in October and November, excluding the days he (the officer) did not work. The officer had a conversation with Frazier and told him he was too old to be around the school during school hours, and Frazier left. The officer told him that being in the surrounding area of the school as he was, was loitering, and if he was not engaged he would be close enough to be considered in the area of gambling games, and advised him of the illegal parking of his car and the idleness of standing by it.

Officer Kington, of the Los Angeles Police Department, testified that on November 20, 1968, the date defendants were arrested, he was officer-in-

charge of special operations squad, assigned to the 77th Street division. Around noon on that day he was present at a briefing of some officers of the squad and some other patrolmen of the division. About 12 people took part in the briefings, which officers on duty around the school attended. A special plan was formulated that day by Sergeant Kington concerning Locke High School. At the briefing, after Sergeant Kington had received information regarding the past problems surrounding the schools, he assigned the school cars to patrol the perimeter of Locke and Fremont High Schools in an attempt to observe any loitering and warn the loiterers, to make an attempt to take their names and request the loiterers to remove themselves from this vicinity, and to inform them that this was a violation of law. Part of the plan was to make arrests of persons around Locke High School that day if the previous problem prevailed. The sergeant informed the officers to broadcast activities regarding loitering at the schools and that if a group grew to such a size as had been indicated in the past where the school car could not handle the situation, or any violence took place in regards to officers, that they inform the sergeant immediately and he would assign units to the vicinity. He instructed the officers to call him every 30 minutes to inform him of the activity, which they did. The plan was executed by the special operations squad, composed of ten policemen and Sergeant Kington, and two school car units of four officers. Sergeant Kington instructed Officer Hines to give closer surveillance to Locke High School and other high schools in the 77th division, to instruct individuals around the perimeter to leave the vicinity if they were loitering, and to contact him if the group grew to a size which Officer Hines and his partner could not handle. Officers Felix and Mott attended the above meeting at the 77th Street station. Sergeant Kington was called in on November 20 for this specific problem.

Officer Baldwin testified that he arrived at the intersection of 111th Street and Avalon, where gambling was in progress, at 2 p.m., and he called his supervisor to report this. He talked to defendants Fuller and Caldwell in the parking lot of stand number 2, about 10 feet away from gambling games. Before he talked to defendant Fuller, defendant Fuller was seated in the right front seat of a 1955 Chevrolet, talking to four or five females, and defendant Caldwell was standing to the rear of the vehicle. There were 20 to 30 people in the vicinity and roughly 17 in the parking lot of the stand. In Officer Baldwin's opinion, defendants Fuller and Caldwell were engaged in the gambling which was going on 10 feet away. The radio in defendant Fuller's vehicle was playing very loudly and in the opinion of the officer was disturbing the peace. Stand number 2 was not open and Fuller was not eating or drinking anything before his arrest, but was yelling loudly and doing a lot of talking. The gambling game broke up

when the officer stepped from the police vehicle. He told these defendants that if they attended school to get on the school grounds, if not, to leave immediately. They replied they were not students. Officer Baldwin took part in the arrest of Fuller and Caldwell for loitering and while he was attempting the arrest the crowd moved in. The arrest was partially based on the fact that the officer had seen the car earlier in the area at the same location and it had not moved and the stand was not occupied for business. Officer Baldwin's partner, Officer Rhodes, arrested defendant Caldwell at this location for loitering after Caldwell had evaded Officer Rhodes. Before the arrest, Officer Baldwin heard derogatory racial statements coming out of a crowd which had gathered, and while he was arresting Fuller fellow officers drew their batons. After the defendants were placed in the police vehicle, it was surrounded by numerous juveniles who came up and reached their hands through the front window of the vehicle, unlocking the doors and opening them up. Fuller and Caldwell alighted from the police vehicle and the officers placed them back in the car and locked the doors, trying to hold the crowds off and protect themselves. Again somebody reached through the front doors and unlocked them and both defendants left the police vehicle and they again were placed back in the car. At that time, Officer Baldwin became engaged in an altercation with another person whom he restrained and placed a help call to other units for assistance. A crowd of between 30 to 50 people gathered and on three occasions the arms and upper torso of people on the outside of the police vehicle came into the police vehicle and contacted the officer. Both defendants Caldwell and Fuller yelled at Officer Baldwin and in the police vehicle called him "pig," "honky," and "white racist."

Before the arrest, Officer Baldwin had seen Fuller several times that day, each time in the vicinity of his vehicle. One time the hood and trunk were up and he was standing beside the vehicle and at other times he was seated in the vehicle with the trunk open and in the passenger side of the vehicle with the hood and trunk closed and the doors open. On the occasion when he was outside of the vehicle, there were other persons with him, some seated in the vehicle. Rather close to this location was a group engaged in a gambling game. A couple of hours before the arrest, Officer Baldwin had told Fuller to move his car from 111th Street. About 10 minutes before the arrest, both Caldwell and Fuller were at stand number 2, and Caldwell was in the vicinity of Fuller's car.

Defendant Fuller testified that on the day of the arrest he did not have a job during the day and was attending night school. He was 23 years old, and lived 10 or 11 blocks from the high school with his wife. When the police officers were taking him from one police vehicle to another, he tried to leave the police officers and tried to escape. There could have been 100

people around the police vehicles and he heard them yelling at the police and calling names to the police while he was in the police car. Defendant Caldwell testified that he was attending night school and did not work during the day.

Officer Felix testified that at 2:45 p.m. on November 20, he was in a police vehicle at the southeast corner of 111th Street and Avalon and observed approximately six males standing around. He asked them if they attended the high school, and they said no, and he told them it was unlawful to loiter and advised them to leave. At this time all left except defendant Frazier and another, who remained. Stand number 1 was located at this location and was closed. At this time school was in session and Officer Felix did not see any people coming from the school.

Officer Mott was Officer Felix's partner, and arrested defendant Frazier at stand number 1 around 2:45 or 2:50 p.m. Officer Mott testified that he arrived at the stand about five minutes before arresting Frazier. He first saw Frazier standing in a group in front of the stand with about six to eight minors, aged 16 to 18. Frazier was doing nothing and Officer Mott talked to the group and advised them of Penal Code section 653g, loitering around school grounds, and the group dispersed except Frazier and another. Officer Mott arrested Frazier after three to five minutes had elapsed. Defendant Frazier was 18 years old and lived 11 blocks from the school and was not going to school on November 20.

None of the defendants refuted or explained his frequent presence in the school area prior to November 20, 1968, and Caldwell's counsel objected when the People attempted to go into this subject on cross-examination of Caldwell.

The trial judge instructed the jury that loitering "is defined to mean lingering, waiting and delaying . . . of such a nature that from the totality of the defendant's action and in the light of the prevailing circumstances, it may be reasonably concluded that it is being engaged in for the purpose of committing a crime as opportunity may be discovered."

Section 653g of the Penal Code[1] was enacted in 1967 as a re-enactment of subdivision (2) of former Penal Code section 647a. In 1964 *In re Huddleson*, 229 Cal.App.2d 618, 625 [40 Cal.Rptr. 581], upheld the constitutionality of section 647a, subdivision (2), by construing it to apply "only when the loitering is of such a nature that from the totality of the person's actions and in the light of the prevailing circumstances, it may be reason-

---

[1]"Every person who loiters about any school or public place at or near which children attend or normally congregate is a vagrant, and is punishable by a fine of not exceeding five hundred dollars ($500) or by imprisonment in the county jail for not exceeding six months, or by both such fine and imprisonment."

ably concluded that it is being engaged in 'for the purpose of committing a crime as opportunity may be discovered.' " (citing *In re Cregler,* 56 Cal.2d 308 [14 Cal.Rptr. 289, 363 P.2d 305]). The re-enactment after *Huddleson* suggests that the Legislature intended the holding there to apply to section 653g. (45 Cal.Jur.2d, Statutes, § 124.)

■ Under the rule in *Huddleson,* section 653g becomes in effect a specific intent crime, so that there must be substantial evidence that the defendants intended to commit crime as the opportunity may have appeared. ■ No specific evidence is necessary to show this intent, but all of the circumstances constitute evidence from which the jury may infer it, and the only question on appeal is whether such evidence is substantial. (Pen. Code, § 21; *People* v. *Tolstoy,* 250 Cal.App.2d 22 [58 Cal.Rptr. 148]; *People* v. *Kranhouse,* 265 Cal.App.2d 440 [71 Cal.Rptr. 223].) ■ The statute does not require that the defendant have an opportunity to commit the crime for which he is loitering, or that he have any proximity to it. Neither a crime nor the opportunity to commit one need actually occur, and a fortiori no proximity need be shown. ■ The requirement of *Huddleson* that defendant be present "for the purpose of committing a crime as opportunity *may be* discovered" (italics added) implies that the opportunity need not actually occur but only be awaited. Nor need there be evidence that the defendant ever took any steps toward the commission of any specific crime, or committed any prior crime. Assuming that there must be evidence that defendants were lingering to commit some *specific* crime, such evidence may fall far short of what would be necessary to convict for such crime. No specific evidence is necessary to show what such crime is, or defendant's relation to it. On appeal, it is enough if considering all the evidence there is substantial evidence that the defendants were lingering for the purpose of committing any specific crime.

■ As to the defendant Fuller, the evidence showed that at the time of his arrest he was a 23-year-old, unemployed, and married nonstudent who for two prior months had repeatedly frequented the high school area without any apparent business there; that the area had a high incidence of crime involving gambling, fighting, narcotics and alcohol; that he was repeatedly warned to leave and would do so; that on one occasion he was under the influence of alcohol, on others he was present where gambling was going on, and on others he was illegally parked. Further, that at the time of the arrest he was 10 feet from and possibly participating in gambling, playing his car radio loudly enough to be disturbing the peace, and yelling loudly; and that after his arrest he twice attempted to and did escape from the police vehicle and yelled inflammatory insults at the officer. By the above test we find that on the entire record here there is substantial evidence

to support a conviction of section 653g that defendant Fuller was lingering to commit, as he may have discovered the opportunity, one or more of the following crimes: gambling (Pen. Code, § 330); interference with lawful arrest (Pen. Code, § 148); resisting arrest, either lawful or unlawful (Pen. Code, § 834a); disturbing the peace (Pen. Code, § 415); being under the influence in a public place (Pen. Code, § 647, subd. (f)); participating in an unlawful assembly (Pen. Code, § 308); and remaining present at a place of unlawful assembly after being warned to disperse (Pen. Code, § 409).

As to the defendant Caldwell, the evidence showed, in addition to the high crime incidence, that at the time of his arrest he was not working or going to school during the day, and that prior to that time he had been in the school area numerous times a day on numerous occasions without any apparent business; that in conversations during school hours an officer had told him to leave the area, which he did; that on one occasion he was present at a gambling game which broke up when the police appeared, when he was warned by an officer that arrests would be made for gambling and being present at gambling. At the time of his arrest he was also close to or participating in gambling and thereafter twice escaped from one police vehicle and used inflammatory epithets toward the police officer.

By the same test there is substantial evidence as to defendant Caldwell as to the crimes of gambling, interference with lawful arrest, resisting arrest, participating in unlawful assembly, and remaining present at a place of unlawful assembly after being warned to disperse.

As to defendant Frazier, on the other hand, there is no evidence that on November 20, 1968, he was in close proximity to any unlawful activity or assembly, or that he engaged in any illegal conduct other than the alleged section 653g violation. Nor is there any substantial evidence that at the time of his arrest defendant Frazier intended to violate any laws as the opportunity might be discovered.

The judgments as to defendants Fuller and Caldwell are affirmed, and the judgment as to defendant Frazier is reversed.

Wood, P. J., and Thompson, J., concurred.

The petition of appellants Fuller and Caldwell for a hearing by the Supreme Court was denied November 5, 1970. Peters, J., was of the opinion that the petition should be granted.